IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| VASCULAR ACCESS CENTERS, L.P., | : | |
| | : | |
| *Appellant,* | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| PHILADELPHIA VASCULAR | : | CIVIL NO. 22-4981 |
| INSTITUTE, LLC et al., | : | |
| | : | |
| *Appellees.* | : | |
| | : | |

## MEMORANDUM

**Scott, J.**                                                                    **March 18, 2025**

This is an appeal from the Bankruptcy Court's Opinion and Order awarding sanctions, in the amount of $1,417,861.75 in legal fees/expenses against Appellants Philadelphia Vascular Institute, LLC ("PVI") and James McGuckin, M.D. ("McGuckin") (collectively, "Appellants"). For the reasons that follow, the Bankruptcy Court's Opinion and Order awarding sanctions will be affirmed. An appropriate Order will follow.

## I.    BACKGROUND & PROCEDURAL HISTORY[1]

The Debtor here, Vascular Access Centers, L.P. ("VAC"), was founded in April 2005 by McGuckin. A.1693, A.1811. It was formed in order to operate and manage outpatient vascular access centers. At these centers, physician interventionalists performed dialysis access procedures and certain other vascular access procedures on patients with end-stage renal disease and other vascular conditions or diseases. A.1694. The general partner of VAC was Vascular Access

---

[1]    The facts in this Section are derived from the Appendix submitted with Appellants' brief, ECF No. 22, Appendix (hereinafter, "A") and the Supplemental Appendix, ECF No. 23, Supplemental Appendix (hereinafter, "SA"), submitted with Appellee's brief.

May 2005, William Gardner ("Gardner"), who was a longtime friend and business partner of McGuckin, and a handful of others became limited partners of VAC. A.1694. Gardner contributed around $11,000,000 to VAC, making him the majority limited partner, holding 72.5% of VAC's equity. A.1694.

In January 2016, Gardner and other VAC limited partners filed a derivative lawsuit on behalf of VAC against McGuckin and VAC LLC in the Pennsylvania Court of Common Pleas for Delaware County (the "Derivative Litigation"). A.1697–A.1678. In the Derivative Litigation, plaintiffs alleged that McGuckin and VAC LLC violated VAC's limited partnership agreement and breached their fiduciary duties. A.4. The plaintiffs sought an order directing McGuckin and VAC LLC to:

> disgorge for the benefit of VAC all profits from certain alleged competitive centers operated by McGuckin-owned entities ("McGuckin Competitive Centers"); prevent[] McGuckin and VAC LLC from taking for themselves any profits generated by McGuckin Competitive Centers; direct[] . . . McGuckin Competitive Centers [to] operate as VAC centers; and award[] money damages for the fair market value of resources McGuckin and VAC LLC allegedly misappropriated from VAC in opening and operating certain McGuckin Competitive Centers and punitive damages.

*Id.*

In July 2018, days before trial in the Derivative Litigation, McGuckin filed a petition to compel arbitration. A.5. The Pennsylvania State Trial Court denied the petition and the Superior Court affirmed on April 22, 2019. *Id.* McGuckin then filed for rehearing *en banc*, which the Superior Court denied on June 12, 2019. *Id.* The plaintiffs in the Derivative Litigation then filed a motion to recover certain attorneys' fees and costs. *Id.* Meanwhile, on July 10, 2019, McGuckin filed a petition for allowance of appeal of the Superior Court's order denying re-argument. *Id.* Soon thereafter, on July 31, 2019, the Superior Court granted the Derivative Litigation plaintiffs'

motion to recover certain attorneys' fees and costs, and a hearing was set for November 13, 2019, before the Pennsylvania State Trial Court to determine the amount of sanctions. A.5–6, A.1710.

In October 2019, McGuckin, on behalf of VAC, engaged an attorney at Dilworth Paxson LLP ("Dilworth") to obtain legal services in connection with VAC's financial restructuring. A.1712. To that end, Dilworth sought Gardner's consent, as the majority-in-interest limited partner, to file a voluntary Chapter 11 bankruptcy petition on behalf of VAC. A.5–A.6. Counsel for Gardner in the Derivative Litigation indicated that Gardner would be willing to consider consenting to a bankruptcy petition upon receiving more information about, *inter alia*, who would run VAC during the bankruptcy. A.6. On November 11, 2019, Dilworth responded that VAC contemplated no management changes and that there was no time for protracted negotiations prior to a bankruptcy filing. A.6, A.1712. Counsel for Gardner responded with disappointment regarding the lack of information and represented that Gardner had offered multiple times to provide VAC additional capital predicated on governance changes. A.6, A.1712–13. On November 12, 2019, Dilworth responded that more detailed discussions and negotiations could occur within the Chapter 11 bankruptcy forum, that the need for a bankruptcy filing was extremely urgent, and that VAC preferred to obtain capital from McGuckin which was not accompanied by demands or conditions. A.6, A.1713.

That same day, the Pennsylvania Supreme Court denied McGuckin's petition in the Derivative Litigation. A.6. Hours after the Pennsylvania Supreme Court denied the petition—and the day before the sanctions hearing was scheduled before the State Trial Court—three purported creditors of VAC filed an involuntary Chapter 11 petition against VAC, thereby staying the Derivative Litigation. A.6–7. The three purported creditors were: (1) PVI, an entity wholly owned and controlled by McGuckin, which alleged that VAC was indebted to it on account of "secured

3

loans" of $1,202,120; (2) Metter & Company, an accounting firm owned by Stan Metter, one of VAC's limited partners, based on "accounting services" in the amount of $11,911.25; and (3) Crestwood Associates, LLC, an entity owned by McGuckin's brother, Brian McGuckin, on account of "vendor" in the amount of $6,090. A.7, SA.2. On November 13, 2019, McGuckin signed and filed a document consenting to the Involuntary Petition on behalf of VAC as the sole member and manager of VAC's General Partner. A.7, SA.6–10.

Shortly thereafter, on November 19, 2019, VAC filed a motion to use cash collateral and provide adequate protection to PVI as a secured creditor (the "Cash Collateral Motion"). A.8, SA.11–23. The Cash Collateral Motion represented that PVI held various promissory notes totaling $4,257,626, which were "secured by a properly perfected, first priority security interest in and lien on substantially all of the assets of the Debtor." A.8–9. One day after the Cash Collateral Motion was filed, the Office of the United States Trustee ("UST"), a division of the Department of Justice tasked with overseeing bankruptcy cases, requested copies of PVI's alleged promissory notes, UCC filings, and the payment history on PVI's liens. A.1715. VAC failed to provide any of the requested information. *Id.* The next day, the UST informed Dilworth that the Trustee had located the UCC Statement and inquired about a possible preference action against PVI. A.1715–16. Shortly thereafter, on the same day, VAC withdrew the Cash Collateral Motion. A.1716.

On November 22, 2019, Gardner moved to dismiss the bankruptcy case or, alternatively to appoint a Chapter 11 trustee ("Gardner's Dismissal Motion"). SA.24–78. Gardner's Dismissal Motion alleged that McGuckin orchestrated the involuntary proceedings in bad faith in order to gain a tactical advantage in the Derivative Litigation and, therefore, argued that dismissal of the bankruptcy case was warranted. In the alternative, Gardner argued that a Chapter 11 trustee should be appointed to safeguard VAC's bankruptcy estate. SA.24–26. In support of Gardner's Dismissal

4

Motion, he submitted a sworn declaration to which 39 exhibits were attached, including the amended complaint in the Derivative Litigation. SA.79–84.

On December 19, 2019, the UST filed its own motion to dismiss ("UST Dismissal Motion," collectively with Gardner's Dismissal Motion, the "Dismissal Motions") primarily arguing that dismissal was appropriate for the following reasons: (1) that McGuckin had orchestrated the involuntary petition with the creditors to gain a tactical litigation advantage in the Derivative Litigation; (2) that McGuckin's conflicts of interest would make it impossible for him to satisfy his fiduciary duties as manager of the general partner controlling VAC-in-possession; and (3) "irregularities" in the Cash Collateral Motion. A.9–10. VAC filed its objection to Gardner's Dismissal Motion on December 19, 2019, and an objection to the UST Dismissal Motion on December 24, 2019. A.10. On January 16, 2020, Gardner filed a reply, and a declaration in support of the reply, which incorporated certain discovery obtained in connection with the involuntary filing. A.1717. Neither McGuckin nor PVI filed objections to the Dismissal Motions, nor did they join in VAC's opposition despite filing notices of appearances in the case. SA.122–23.

On February 5, 2020, the parties to Gardner's Dismissal Motion (VAC and Gardner) submitted a Joint Stipulation of Undisputed Facts to the Bankruptcy Court. A.1743. In addition, Gardner filed a Request to Take Judicial Notice, in which he asked the Bankruptcy Court to take notice of the filings of certain pleadings in the Derivative Litigation, the filing of certain judicial orders and opinions in the Derivative Litigation, and the publication of one newspaper article. SA.413–16.

On February 6, 2020, the Bankruptcy Court held an evidentiary hearing on the Dismissal Motions ("Dismissal Hearing"). A.10. Counsel for McGuckin and PVI was present at the hearing.

A.1738–39.  Before testimony began, Gardner's counsel confirmed that the "preferred remedy" at that point was appointment of a Chapter 11 trustee, rather than dismissal.  A.1744.

Also prior to testimony, VAC's counsel objected to Gardner's Request to Take Judicial Notice.  A.1747–48.  Counsel for Appellants did not object.  Gardner's counsel represented that the documents were filed simply to establish the procedural history of the Derivative Litigation and that Gardner was not asking the Court to take judicial notice of the facts contained therein. A.1750–A.1751.  In response, the Bankruptcy Court indicated that it did not see the "import of this" and that if it is just for "the procedural history of the State Court litigation, that seems fine." A.1751.  Counsel for Gardner then moved for his exhibits and deposition designations to be entered into evidence, to which there was no objection from VAC or Appellants.  A.1753–54.  The UST's exhibits and VAC's exhibits were also entered into evidence.  A.1907–08, A.2046–47.  Appellants did not submit any exhibits.

The Court then proceeded to hear testimony.  VAC called three witnesses: Michael Dubin, a financial "monitor" that had been appointed in the Derivative Litigation, McGuckin, and Mark Tucci (VAC's then-CFO), each of whom Gardner would cross-examine as part of his case (collectively, "Witnesses").  A.1756.  Neither VAC nor Appellants called or sought to call Gardner to testify.  Appellants did not question any of the witnesses that appeared.

The testimony that is particularly pertinent to this appeal is McGuckin's.  During his testimony, VAC's counsel showed McGuckin a copy of a secured promissory note dated December 19, 2018 in favor of PVI from VAC in the principal amount of $500,000.  A.11, A.1859–60.  In response to VAC's counsel's questions about the details of the loans from PVI to VAC, McGuckin testified that PVI had loaned VAC: (1) $500,000 in December 2018; (2) $225,000 in May 2019; (3) $250,000 in September 2019; and (4) $347,000 in October 2019.  A.11,

6

A.1859–60. Based on the testimony, it did not appear that PVI loaned any other amounts to VAC despite the statements in the Cash Collateral Motion stating that PVI loaned VAC a total of $4,257,626. A.1718. During cross-examination of McGuckin, as the Bankruptcy Court stated, "McGuckin completely contradicted his testimony during direct examination and admitted, for the first time, that PVI actually had not loaned *any* amount to VAC." A.1718. Rather, all the money came from other entities owned by McGuckin or from his personal account. A.1719.

In addition, when questioned regarding the suspicious timing of the Involuntary Petition—on the eve of the hearing regarding the amount of sanctions to be awarded against McGuckin in the Derivative Litigation—McGuckin claimed it was "100%" a "total and utter coincidence." A.1949–50. McGuckin maintained this assertion even after being shown a November 12, 2019, text message to his brother insisting that the Involuntary Petition has "gotta go down today." A.29, A.1545. In response, McGuckin's brother directed Crestwood personnel to manufacture an invoice despite the fact that Crestwood had provided no services for VAC at the time. A.29–31.

McGuckin's testimony also addressed a consent decree he signed with the State of Washington Medical Quality Assurance Commission following its investigation of his performance. A.1718. McGuckin testified that although he signed the consent decree, there were certain statements he made in the Consent Decree that he believed were not true and that he only signed it because he did not have any choice but to do so. A.1718.

At the conclusion of the all-day hearing, the Bankruptcy Court announced, based on the record before it, that:

> [a]fter hearing the testimony of Dr. McGuckin today, frankly, I'm horrified. . . . I find Dr. McGuckin to be completely lacking in credibility. I find him to be untrustworthy. I find him to be self-dealing in every manner possible. I believe Dr. McGuckin, that you think that you put a ton of money into this debtor and you don't understand why the limited partners aren't supporting you and why

7

> they don't give capital contributions. I think that possibly you're lying, but certainly, perhaps, you're delusional. They don't want to give money to the debtor because they don't trust you. And frankly, I don't trust you. And although I cannot order something today, because my—my clerk's office is closed, it will be entered tomorrow. And you are not going to have anymore [sic] control of this debtor. It is absolutely clear to me that your [sic] unable to discharge your responsibilities to this debtor. It's absolutely clear to me that there are a number of conflicts of interests which you have acknowledged.

A.12. The Bankruptcy Court then went on to describe the reasons supporting its ruling that the Involuntary Petition was orchestrated by McGuckin in bad faith and that appointment of a Chapter 11 trustee was warranted. A.2076–86.

Following the Bankruptcy Court's bench ruling, an on-the-record exchange occurred concerning the management of VAC during the interim period until a Chapter 11 trustee could be formally appointed. A.2086–88. The Bankruptcy Court stated that it did not want McGuckin making any decisions for VAC during that time and to the extent any decisions needed to made in the immediate future, counsel for VAC should reach out to UST and counsel for Gardner. A.2087. In that context, the Bankruptcy Court remarked that it found "Mr. Gardner to be entirely credible" and, therefore, able to assist in decision-making for VAC's operations until a Chapter 11 trustee could be appointed. *Id.* Immediately after the Dismissal Hearing, McGuckin resigned from his management positions at VAC and withdrew VAC LLC as the general partner, effective immediately. A.12.

After the Dismissal Hearing, the Bankruptcy Court issued a thorough, well-reasoned written opinion ("Trustee Opinion") concluding that the appointment of a Chapter 11 trustee was in the best interest of VAC's creditors and the bankruptcy estate. A.1693–1736. The Trustee Opinion found, *inter alia*:

> (1) the petitioning creditors did not satisfy the statutory criteria for filing the petition, the involuntary petition was not meritorious, and the creditors failed to make a reasonable inquiry into the relevant facts and pertinent law before filing, as evidenced by the fact that: (a) Crestwood did not hold any claims against VAC immediately prior to the involuntary filing, but nevertheless manufactured a false invoice for VAC at the direction of McGuckin and (b) PVI's $1.2 million claim was entirely false; (2) McGuckin caused PVI to file a UCC Statement on the eve of the involuntary filing which constituted a preference and, more importantly, PVI never loaned any money to VAC; (3) the involuntary filing was used by McGuckin to obtain a disproportionate advantage for himself, and a tactical advantage, in the Derivative Litigation, rather than to protect VAC's interests; and (4) . . . the timing of the filing of the involuntary petition was suspicious since there was no reason that VAC had to be in bankruptcy by November 12, 2019 and McGuckin needed VAC to be in bankruptcy by such date in order to avoid being sanctioned in the Derivative Litigation.

A.1729–30. Ultimately, the Bankruptcy Court concluded that McGuckin "is not credible and untrustworthy, and consistently puts his own interests ahead of VAC." A.1693. The Trustee Opinion also stated that:

> "[g]iven troubling inconsistencies in the involuntary petition, the Cash Collateral Motion, and the documents and testimony given at trial, the Court will review the transcript of the trial when it becomes available and, unless an interested party files a motion for sanctions under, *inter alia*, Rule 9011 in a timely fashion, the Court will consider whether it would be appropriate to enter an order to show cause why certain parties or attorneys should not be subject to sanctions."

A.1719. Following the issuance of the Trustee Opinion, the Bankruptcy Court approved the appointment of Stephen V. Falanga as the Chapter 11 trustee for VAC. A.14.

On March 20, 2020, Gardner filed a motion requesting sanctions against Appellants ("Sanctions Motion"). A.473–97. On April 17, 2020, McGuckin and PVI filed separate objections to the Sanctions Motion. A.548–601, A.602–24. The Bankruptcy Court held evidentiary hearings

on the Sanctions Motion on September 30, 2021 and October 1, 2021 ("Sanctions Hearing").
A.66–68, A.334–36.

The delay in holding this hearing on the Sanctions Motion was originally due to the fact
that McGuckin and VAC LLC appealed the Trustee Opinion and Order to the Eastern District of
Pennsylvania[2] and the Sanctions Motion was related almost exclusively to findings made in
connection with the Trustee Opinion and Order. A.15. Briefing in the Trustee Opinion and Order
appeal was completed on June 24, 2020; however, in early April 2021, McGuckin filed a request
to supplement the record to include deposition testimony from a separate malpractice action
brought by McGuckin against VAC's former corporate counsel concerning VAC's partnership
agreement. A.15–16. On April 15, 2021, the District Court, instead of supplementing the record
on appeal, dismissed the appeal and remanded the case to the Bankruptcy Court in order to give it
an opportunity to determine whether the supplemental deposition justified reconsideration of the
Trustee Order. A.16.

On April 23, 2021, days before a hearing on the Sanctions Motion was scheduled,
McGuckin and VAC LLC filed a Recusal Motion. SA.163–75. The Recusal Motion is particularly
relevant to this appeal as it advances some of the same arguments that Appellants present to this
Court. Specifically, the Recusal Motion argues, *inter alia*, that the Bankruptcy Court lacked
impartiality because (1) it had, in support of its Trustee Opinion, "accepted as fact the unsupported
averments from Gardner's Derivative Litigation Complaint and Gardner's expert report, all of
which was entirely hearsay, and liberally cited those hearsay documents as evidence in the
Opinion;" and (2) it "found Gardner 'entirely credible' when he didn't even attend the hearing, let
alone take the stand and testify." SA.164–66. Both Gardner and the Chapter 11 trustee, Mr.

---

[2]        McGuckin and VAC LLC did not seek to stay the Trustee Order pending this appeal. A.15.

Falanga, filed objections to the Recusal Motion.  A.16.  The Bankruptcy Court held a hearing on

this Recusal Motion on June 9, 2021, and then, on June 25, 2021, it issued a thorough Opinion

finding no grounds to recuse ("Recusal Opinion) and entered an order denying the Recusal Motion.

SA.176–205.

In its Recusal Opinion, the Bankruptcy Court explained that "[i]n the background section

of the Trustee Opinion, the Court summarized some of the allegations which Gardner had made

against McGuckin in the Derivative Litigation, citing in part to the amended complaint in the

Derivative Litigation," but made its decision, that "McGuckin had orchestrated the involuntary

petition in bad faith in order to stay the sanctions hearing in the Derivative Litigation" "primarily

. . . based upon postpetition discovery obtained by Gardner and McGuckin's testimony."  SA.188–

89.  The Bankruptcy Court further explained:

> [N]o reasonable person would question the Court's impartiality
> based upon immaterial references to the Derivative Litigation
> allegations and expert report in the Trustee Opinion.  The references
> which McGuckin complains of were simply made by way of
> background, and, in fact, the qualifier "Gardner alleges" precedes
> the reference to the Derivative Litigation allegations McGuckin
> cited in the Recusal Motion as problematic. . . .  Counsel for VAC
> stated on the record that the Court was permitted to consider
> allegations in the Derivative Litigation as allegations, which it did.
> . . . Furthermore, none of the references to the Derivative Litigation
> allegations or expert report McGuckin complains of in the Recusal
> Motion had any material role in the Court's decision to appoint a
> Chapter 11 trustee.

SA.199–200.

Additionally, the Bankruptcy Court explained that its single reference to Gardner as

"credible" was not made "in connection with its oral statement of reasons supporting its decision

to appoint a Chapter 11 trustee," but rather, was made "casually at the very end of a lengthy

hearing" as merely an attempt to "assist the parties with a side issue of who was best suited to act

on behalf of VAC pending the Chapter 11 trustee's appointment." SA.198. Therefore, the Bankruptcy Court explained, "no reasonable person would question the Court's impartiality based upon a random comment at the end of a hearing after the ruling had already been issued." SA.198.

On July 6, 2021, McGuckin and VAC LLC filed a petition with the Third Circuit Court of Appeals seeking to have the Third Circuit issue a writ of mandamus reversing the Recusal Order ("Mandamus Petition"). A.17. That same day, McGuckin and VAC LLC filed a motion to stay with the Bankruptcy Court requesting that the Bankruptcy Court issue an order staying consideration of, *inter alia*, the reconsideration of the Trustee Opinion and the Sanctions Motion pending a decision from the Third Circuit on the Mandamus Petition. *Id.* The Bankruptcy Court issued a "temporary stay," which was lifted upon the Third Circuit's denial of the Mandamus Petition on July 20, 2021. *Id.* Following the Third Circuit's decision, the Bankruptcy Court scheduled the hearing on the reconsideration of the Trustee Opinion and the Sanctions Motion ("Sanctions Hearing"). A.17–18.

At the Sanctions Hearing, the following three witnesses testified: (1) Chris Hall, counsel to VAC in connection with a qui tam action brought against VAC by the U.S. Department of Justice; (2) David Smith, counsel for the Petitioning Creditors and for PVI in defending against the Sanctions Motion; and (3) Lawrence McMichael, counsel from Dilworth who represented VAC at in the bankruptcy prior to the appointment of the Chapter 11 trustee. A.18–23, A.66–68, A.334–36. Only the testimony of Mr. Smith and Mr. McMichael were pertinent to the Bankruptcy Court's decision on the Sanctions Motion. *See* A.18 (portion of Sanctions Opinion noting that "[w]hile the Court found . . . Mr. Hall to be a very credible witness, his testimony was largely irrelevant given that the Sanctions Motion was not in any way based upon McGuckin's actions in connection with the DOJ Settlement").

Mr. Smith testified on the first day of the Sanctions Hearing. His testimony revealed, among other facts, that he was assured of the validity of Crestwood's claim against VAC in the Involuntary Petition as he had become aware prior to the filing of the Petition that Crestwood had already begun providing services to VAC. A.19. However, McGuckin's brother testified repeatedly in his deposition in connection with Gardner's Dismissal Motion that Crestwood had not provided any services to VAC for which Crestwood was owed payment at that time. *Id.* Mr. Smith's testimony also revealed, that McGuckin personally confirmed the validity of the PVI loans, and that McGuckin had emailed Mr. Smith and Mr. McMichael to file the Involuntary Petition the day before the sanctions hearing was scheduled in the Derivative Litigation. A.271–73, A.289, A.2049–50, A.1556.

Mr. McMichael testified on the second day of the Sanctions Hearing. His testimony revealed, among other facts, that VAC needed to urgently file for bankruptcy in order to make the next payroll and an upcoming settlement payment owed to the Department of Justice. A.359–60. However, evidence showed that VAC had been able to fund both the settlement payment and generally pay its expenses based on available funds. A.21. In addition, Mr. McMichael's testimony discussed correspondence between him and McGuckin's counsel in the Derivative Litigation less than a week prior to the Involuntary Petition, wherein McGuckin's counsel in the Derivative Litigation stated that they wanted to avoid the Derivative Litigation sanction hearing, so the Involuntary Petition needed to be filed before then. A.423, A.1535–36. Evidence also revealed that in the days prior to the Derivative Litigation sanction hearing, Mr. McMichael and others decided to pursue an involuntary as opposed to voluntary petition based on McGuckin's desire to have bankruptcy filed that day. A.22, A.1540.

On October 28, 2021, the Bankruptcy Court entered an Order finding McGuckin and PVI liable for sanctions pursuant to 11 U.S.C. § 105(a), the Court's inherent power, and Rule 9011 of the Federal Bankruptcy Rules, and scheduling further proceedings to determine the sanctions amount based on the fees and expenses Gardner incurred.  A.469–72.  Initially, Gardner requested approximately $2.5 million, the entire amount of Gardner's counsel's legal fees and costs ("Initial Application").  A.672–91.  McGuckin and PVI filed Objections to Gardner's Initial Application, and, in support of their objections, they included a declaration from Jeffrey L. Cohen, a purported expert in evaluating bankruptcy fees ("Cohen Declaration").  A.1200–21.  Included with the Cohen Declaration was a report by "Legal Decoder, Inc." ("LDI"), a software system which analyzes legal billing and invoice data and creates a list of problematic billing behaviors.  SA.230–31.  Gardner moved to strike and exclude the Cohen Declaration and the LDI report, which after a hearing on the motion, the Bankruptcy Court granted ("Exclusion Order").  SA.206–26, A.1253–58.

In its Exclusion Order, the Bankruptcy Court explained, "a determination regarding the reasonableness of Gardner's Application is not so complicated as to require expert testimony, as this Court is adequately competent by virtue of its own specialized knowledge so as to understand the issues it must consider respecting the reasonableness of the fees and costs sought."  A.1257.  However, the Exclusion Order also made clear that the determination to exclude the Cohen Declaration and the LDI report "does not limit McGuckin/PVI's ability to raise any and all objections which it has to the reasonableness of the Application.  The Court using its own expert knowledge will consider each and every one of those objections, simply, without testimony from Cohen or references to his Declaration or Report."  A.1257.

On February 10, 2022, the Bankruptcy Court held a hearing on the Initial Application and Objections, and then entered an Order directing Gardner to submit a revised fee and expense application, limited to fees and expenses incurred from the petition date through February 7, 2020 and those incurred in connection with: (1) McGuckin's resignation from his position as former CEO of VAC and withdrawal of VAC LLC as the general partner subsequent to the February 6, 2020 Dismissal Hearing; (2) Gardner's motion for sanctions against McGuckin and PVI; (3) the appeal of the Trustee Order; (4) McGuckin's motion seeking the Bankruptcy Court's recusal; and (5) McGuckin's motion seeking reconsideration of the Trustee Order (collectively, "Sanction Categories"). A.1259–60. Gardner complied with this Order and submitted a Supplemental Application, seeking an award in the total amount of $1,480,029.35. A.1261–65. The Supplemental Application included a declaration detailing the fees and expenses for each of the Sanction Categories identified by the Bankruptcy Court. A.1266–326. Appellants filed a Supplemental Objection to Gardner's Supplemental Application, and Gardner submitted a Reply in Support of his Supplemental Application. A.1331–41, A.1342–63.

On December 1, 2022, the Bankruptcy Court entered an Order awarding Gardner sanctions in the amount of $1,417,861.75, along with a 61-page Opinion on the matter ("Sanctions Opinion"). A.1–62. As to McGuckin, the Bankruptcy Court first held that sanctions were warranted pursuant to the Bankruptcy Court's inherent power under 11 U.S.C. § 105(a) for:

> orchestrating the filing of a meritless Involuntary Petition against VAC in bad faith, directing Crestwood to manufacture a false claim in support of that petition, falsely asserting PVI held a $1.2 million secured claim, consenting to the Involuntary Petition in bad faith, and affirming the validity of the false claims to further delay the Derivative Litigation.

A.24. The Bankruptcy Court also held that sanctions against McGuckin were warranted under Rule 9011(b)(1) "because McGuckin caused the meritless Involuntary Petition to be filed for an

improper purpose of delaying the Derivative Litigation." A.24. Lastly, the Bankruptcy Court held sanctions were warranted against McGuckin under Rule 9011(b)(3) "because McGuckin certified in the Involuntary Petition and then continued to affirm PVI's false claim in court representations without reasonable evidentiary support." A.24–25.

The Bankruptcy Court also sanctioned PVI pursuant to its inherent power under 11 U.S.C. § 105(a) and Rule 9011(b)(1), holding PVI "liable, jointly and severally with McGuckin, for signing and causing to be filed on PVI's behalf a meritless involuntary Chapter 11 bankruptcy petition against the Debtor in bad faith, and under Rule 9011(b)(3) for certifying without reasonable evidentiary support PVI's false $1.2 million secured claim in the Involuntary Petition." A.25.

## II.    JURISDICTION & STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 158(a)(1), the district court has jurisdiction to adjudicate appeals "from final judgments, orders, and decrees" of the bankruptcy court. In this role, a district court "review[s] the bankruptcy court's legal determinations *de novo*, its factual findings for clear error, and its discretionary decisions for abuse of discretion." *In re Imerys Talc Am., Inc.*, 38 F.4th 361, 370 (3d Cir. 2022) (internal quotation and citations omitted).

In reviewing the imposition of sanctions, an appellate court applies an abuse-of-discretion standard. *Fellheimer, Eichen & Braverman, P.C. v. Charter Techs., Inc.*, 57 F.3d 1215, 1223 (3d Cir. 1995). In reviewing such an award, the court does "not seek to determine whether [it] would have applied the sanctions [itself] in the first instance." *Id.* (citation omitted).

In reviewing the bankruptcy court's factual findings, the appellate court must "accept the ultimate factual determination of the fact-finder unless that determination either is completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data." *Id.* (internal quotations and citation omitted).

"When there are two permissible views of the evidence, the [bankruptcy court's] choice between them cannot be clearly erroneous." *In re KiOR, Inc.*, 567 B.R. 451, 457–58 (D. Del. 2017) (citation omitted).

## III.   DISCUSSION

There are two primary issues before the Court.  First, whether the Bankruptcy Court abused its discretion by sanctioning Appellants, and second, whether the Bankruptcy Court abused its discretion in determining the amount of sanctions.  As described below, the Court finds that the Bankruptcy Court did not abuse its discretion in either respect.

### A.   Sanction Order

Appellants were sanctioned pursuant to Federal Rule of Bankruptcy Procedure 9011 and the Bankruptcy Court's inherent power under 11 U.S.C. § 105(a).  The Court finds none of Appellants' arguments on appeal regarding the imposition of sanctions persuasive.

#### *1.   Bankruptcy Court's Power to Sanction Pursuant to Rule 9011*

Rule 9011 of the Federal Rules of Bankruptcy Procedure requires parties making representations to the court to certify, *inter alia*, that their submission "is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation," Fed. R. Bankr. P. 9011(b)(1), and that "the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery," Fed. R. Bankr. P. 9011(b)(3).  "In determining whether a party has violated Rule 9011, the court need not find that a party who makes a false representation to the court acted in bad faith;" rather, "[t]he imposition of Rule [9011] sanctions . . . requires only a showing of objectively unreasonable conduct." *In re Taylor,* 655 F.3d 274, 282 (3d Cir. 2011) (citations and internal quotations omitted).

17

## 2. *Bankruptcy Court's Inherent Power to Sanction*

Federal courts, including bankruptcy courts, possess inherent powers to impose sanctions for improper conduct that is abusive to the judicial system. *See, e.g., Fellheimer*, 57 F.3d at 1224. Bankruptcy courts exercise this inherent power pursuant to Section 105(a) of the Bankruptcy Code, which authorizes the issuance of any order "necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a); *see also In re Bailey*, 321 B.R. 169, 178 (Bankr. E.D. Pa. 2005). Inherent power sanctions may be awarded without regard to the signed-writing or safe-harbor provisions of Bankruptcy Rule 9011; however, in such a circumstance, the court must make an "explicit finding of bad faith or willful misconduct." *Id.*

## 3. *The Bankruptcy Court Did Not Abuse its Discretion in Sanctioning Appellants*

Appellants argue that the Bankruptcy Court abused its discretion in numerous ways when it found sanctions against them were appropriate. *See generally* ECF No. 22. First, Appellants argue that the "Bankruptcy Court abused its discretion in relying on its faulty and unconstitutional [Trustee] Opinion." ECF No. 22 at 37. In particular, they argue that the Bankruptcy Court's reliance on the Trustee Opinion to award sanctions was "principally based on its extraordinary finding that Gardner was 'entirely credible,'" despite the fact that Gardner never testified before the Bankruptcy Court. *Id.* at 37–45. Appellants are wrong to suggest that Gardner's credibility was the basis of the Trustee Opinion.

In reaching its decision to appoint a trustee, the Bankruptcy Court considered dozens of documents entered into evidence and several hours of live testimony, including extensive testimony from McGuckin himself. And importantly, neither in announcing its decision from the bench nor in its forty-four page written opinion did the Bankruptcy Court discuss Gardner's "credibility." This Court finds it implausible that the decision could be "principally based" on a

18

finding of credibility, when said finding of credibility is not included in the lengthy opinion discussing the reasons for the decision.

Moreover, in denying Appellants' Recusal Motion, the Bankruptcy Court itself explained the context in which this comment regarding credibility was made, stating:

> [T]he Court's reference to Gardner as "credible" was not made in connection with its oral statement of reasons supporting its decision to appoint a Chapter 11 trustee. Rather, it was made casually at the very end of a lengthy hearing as the Court simply attempted to assist the parties with a side issue of who was best suited to act on behalf of VAC pending the Chapter 11 trustee's appointment.

SA.198. Thus, placed in context, it is clear that this stray remark, made after a long hearing and in response to a logistics question, was not related to the Bankruptcy Court's decision to appoint a trustee and certainly not made in connection with the decision to sanction Appellants.

Appellants also try to recycle other previously raised complaints about the Trustee Opinion. For instance, Appellants argue that the Trustee Opinion is flawed because the Bankruptcy Court relied on allegations in Gardner's Dismissal Motion, his expert report, and the complaint in the Derivative Litigation, none of which were admitted into evidence. By relying on such, the Bankruptcy Court, on Appellants' view, denied McGuckin due process of the law when it failed to provide him the opportunity to confront and cross-examine Gardner's allegations. ECF No. 22 at 40–45. Because this argument was made in Appellants' Recusal Motion, this Court, once again, has the benefit of the Bankruptcy Court's own response to the argument.

As the Bankruptcy Court explained, the references at issue were "simply made by way of background, and, in fact, the qualifier 'Gardner alleges' precedes the reference to the Derivative Litigation allegations." SA.200. The Bankruptcy Court further explained that "none of the references to the Derivative Litigation allegations or expert report McGuckin complains of in the Recusal Motion had any material role in the Court's decision to appoint a Chapter 11 trustee." *Id.*

This Court has no basis to reject this explanation by the Bankruptcy Court, and, in any event, Appellants' focus on peripheral comments and background matters from the Trustee Opinion, which is not before this Court, does not support reversal.

Appellants also argue that the Bankruptcy Court denied McGuckin due process of the law when it failed to provide him the opportunity to confront and cross-examine Gardner's allegations. *See* ECF No. 22 at 45. This, however, is a mischaracterization, as Appellants had ample notice of the various proceedings in this case and had they wished to challenge Gardner's credibility, they could have deposed him or called him as a witness. Thus, there is no violation of due process here, where Appellants simply failed to take advantage of the opportunity to call a witness. *See, e.g.*, *In re Wire Cloth Enters.*, 124 B.R. 194, 195 (W.D. Pa. 1991) (finding "frivolous" a party's argument that it was denied due process because it was unable to cross-examine a witness where party was given ample notice of hearing and failed to avail itself of several opportunities to complete the cross-examination of the witness); *Arteaga-Godinez v. Sessions*, 696 F. App'x 220, 225 (9th Cir. 2017) (holding no violation of party's statutory or due process rights where they "fail[ed] to take advantage of th[e] opportunity" to call or cross-examine witnesses). In conclusion, this Court does not find any of Appellants' arguments concerning the Trustee Opinion persuasive.

Appellants next argue that the Bankruptcy Court abused its discretion by sanctioning Appellants based on the determination that PVI and Crestwood were not valid creditors of the debtor. ECF No. 22 at 45. As to PVI, Appellants argue that PVI was the "real party in interest" of the PVI claim because "PVI had an existing business relationship in privity with VAC before the promissory notes were created; and it is not in dispute that the money in the promissory notes was provided to VAC." ECF No. 22 at 45–46. Therefore, Appellants assert that PVI had a legal

basis "to control the legal enforcement of its claims, whether Dr. McGuckin provided the cash supporting the PVI promissory note on behalf of PVI from other sources." ECF No. 22 at 46.

Appellants' entire theory is premised on the allegation that VAC received all of the loan proceeds pursuant to the promissory notes held by PVI. However, the only promissory note related to PVI's alleged loans was a $500,000 secured promissory note dated December 19, 2018. Nevertheless, assertions by Appellants in filings and by McGuckin during the Dismissal Hearing, claimed sums much higher. For example, in the Involuntary Petition, PVI asserted that it held a claim of approximately $1,202,120 based on "secured loans." A.08. Additionally, the Collateral Motion averred that PVI held "various promissory notes" totaling $4,257,626 "secured by a properly perfected, first priority security interest in and lien on substantially all of the asserts of the Debtor." A.08–A.09. Thus, even if this Court were to accept Appellants' argument that PVI was the "real party in interest" of a claim against VAC, such a claim would be limited to $500,000, not the larger sums asserted by Appellants at various points.

As to Crestwood, Appellants' argument is that on the date of filing the Involuntary Petition, Crestwood had an "unmatured" debt, which still qualifies as a claim. ECF No. 22 at 47–49. Although generally under the Bankruptcy Code a debt qualifies as a "claim" even if it is contingent and unmatured, a debt cannot support an involuntary petition unless it is non-contingent as to liability—i.e., unless "all events giving rise to liability occurred prior to the filing of the bankruptcy petition." *In re City of Detroit*, 548 B.R. 748, 762 (Bankr. E.D. Mich. 2016) (internal quotations and citations omitted). Stated differently, "a claim is contingent if 'it remains uncertain, at the time of the filing of the petition in bankruptcy, whether or not the bankrupt will ever become liable to pay it.'" *In re QDOS, Inc.*, 634 B.R. 552, 555–56 (Bankr. C.D. Cal. 2021) (citations omitted).

Under this standard, Crestwood's claim was contingent at the time it was filed. A review of the record reveals that there was no contract which provided for the services that would have formed the basis of Crestwood's alleged claim. Also, even if VAC had incurred some sort of contractual obligation to pay for Crestwood's services listed in the invoice Crestwood created at McGuckin's insistence, McGuckin's brother repeatedly testified that, at the time the Involuntary Petition was filed, VAC owed nothing to Crestwood on account of those services because none of the services had yet been performed. Thus, at most, Crestwood held a contingent, unmatured claim, which made it unqualified to act as a petitioning creditor. In addition, even if Crestwood's claim could have supported an Involuntary Petition, it did not support the Involuntary Petition here because it was manufactured by McGuckin in order to protect McGuckin's own personal interest in further delaying the Derivative Litigation. *See, e.g.*, A.29. Therefore, Appellants' argument concerning the validity of PVI and Crestwood as petitioning creditors presents no basis to reverse the Bankruptcy Court.

Appellants' final argument as to the Sanction Order is that the "Bankruptcy Court's sanction decision was an abuse of discretion as it ignored the fact that [Appellants] relied on experienced bankruptcy counsel." ECF No. 22 at 49. "The advice-of-counsel defense provides that, if a defendant gives a 'full and honest disclosure of the material facts surrounding a possible course of action, [and] seek[s] and obtain[s] the advice of counsel on the potential legality of [his] actions,' then, in relying on counsel's advice, he 'lack[s] the requisite intent to violate the law.'" *United States v. Haisten*, 790 F. App'x 374, 377 (3d Cir. 2019) (citations omitted). Appellants did not raise an "advice-of-counsel" argument in response to Gardner's Sanctions Motion. Nor did Appellants cite any standard for their "advice-of-counsel" argument or indicate that McGuckin made a full and honest disclosure to his attorneys. To the contrary, a review of the record indicates

that McGuckin did not make a full and honest disclosure to his attorneys. In any event, McGuckin cannot argue that Mr. Smith's or Mr. McMichael's advice excused, for example, McGuckin's signing of documents with the Court that he knew to be false, McGuckin's falsely testifying under oath, McGuckin's pressuring his brother to manufacture an invoice on behalf of Crestwood despite Crestwood having not performed any work, McGuckin's orchestrating an involuntary petition to delay the Derivative Litigation, and McGuckin's advancing a Cash Collateral Motion based on falsities in order to improve his recoveries ahead of others. The Bankruptcy Court clearly concluded that the decisions around Appellants' sanctionable conduct were McGuckin's own.

Ultimately, this Court finds the Bankruptcy Court did not abuse its discretion in any respect by sanctioning Appellants' conduct. Therefore, the Court will affirm the Bankruptcy Court's decision finding PVI and McGuckin liable for sanctions.

### B.    Amount of Sanction Award

Turning to the amount of sanctions, Appellants argue that the amount awarded was an abuse of discretion and excessive for numerous reasons. First, Appellants argue that the Bankruptcy Court erred in excluding the Cohen declaration and that the Bankruptcy Court failed to address the multiple problems with Gardner's fee application. ECF No. 22 at 50–55. As described below, this Court disagrees.

Trial courts have broad discretion in determining whether to permit expert testimony. *See, e.g., Haberern v. Kaupp Vascular Surgeons LTD. Defined Benefit Plan & Tr. Agreement*, 812 F. Supp. 1376, 1378 (E.D. Pa. 1992). Under Federal Rule of Evidence 702, courts are required to act as a "gatekeeper" and therefore must "(1) confirm the witness is a qualified expert; (2) check the proposed testimony is reliable and relates to matters requiring scientific, technical, or specialized knowledge; and (3) ensure the expert's testimony is 'sufficiently tied to the facts of the case,' so

that it 'fits' the dispute and will assist the trier of fact." *UGI Sunbury LLC v. Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832 (3d Cir. 2020) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993)).

"The justification to consider opinion evidence from experts exists if the trier of fact is in need of assistance to help to understand an unfamiliar subject, without which assistance the trier of fact would be unable to understand the highly esoteric, technical and scientific concepts which are beyond his or her ken." *In re McClanahan*, 137 B.R. 73, 74 (Bankr. M.D. Fla. 1992). But "[a] judge is presumed knowledgeable as to the fees charged by attorneys in general and as to the quality of legal work presented to him by particular attorneys; these presumptions obviate the need for expert testimony such as might establish the value of services rendered by doctors or engineers." *Lindy Bros. Builders, Inc. of Phila. v. Am. Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 169 (3d Cir. 1973). Consequently, courts routinely determine the reasonableness of legal fees and expenses to be included in sanctions awards without any expert testimony. *See, e.g., In re Atomica Design Grp., Inc.*, 591 B.R. 217, 245–56 (Bankr. E.D. Pa. 2018) (granting fee petition without expert testimony, explaining "[c]ourts often must assess the experience and skill of the requesting party's attorneys and compare their rates to the rates of attorneys with similar skill and experience"); *In re Bethany Homes, Inc.*, 2010 WL 3081531, at *3 (Bankr. D. Md. Aug 6, 2010) ("In fixing appropriate sanctions for this violation of Rule 9011, the court does not need the testimony of expert witnesses, as it may call upon its own experiences."); *In re McClanahan*, 137 B.R. at 74 ("[I]t requires no elaborate discussion to point out that what is a reasonable fee to be allowed to an attorney who represents debtors in routine Chapter 13 cases is not a highly esoteric, technical, or scientific subject which a bankruptcy judge would not be able to comprehend

without assistance of an 'expert' to explain the intricacies and complex legal principles which govern allowances to attorneys representing debtors in Chapter 13 cases.").

As described in the Background Section, in Appellants included the Cohen Declaration in the joint objection to the Initial Application for fees, which, using the LDI report, identified ten categories of problematic billing entries, including: (a) skillset mismatch; (2) excessive time; (3) block billing; (4) hourly maximum; (5) multi-staffed meetings; (6) office communications; (7) round hour; (8) excessive research; (9) indistinguishable prep time; and (10) vague entry. Mr. Cohen opined that the total maximum sanctions amount in reasonable fees to Gardner should not exceed $555,690.54. ECF No. 22 at 52.

The Bankruptcy Court excluded the Cohen Declaration, finding that it did not require expert testimony to determine the reasonableness of Gardner's Application as the court "is accustomed to reviewing the types of documents submitted in support of the request, routinely assesses the reasonableness of potential fee awards, has overseen this bankruptcy case from its inception and observed the legal work performed in connection therewith, and aside from perhaps the size of the request, there are no other factors identified which would make this matter particularly complex to understand for purposes of assessing the Application." A.1257. This Court agrees that expert testimony was not needed to assist the Bankruptcy Court in determining the amount of sanctions in this case and, therefore, does not find that the exclusion of the Cohen Declaration and LDI report was an abuse of discretion.

In addition, although it excluded the Cohen Declaration and LDI Report, the Bankruptcy Court did not limit McGuckin or PVI from raising any objection to the reasonableness of Gardner's Application. Moreover, the Bankruptcy Court's thorough Sanctions Opinion meticulously considered each of the objections raised by Appellants and reduced the fees and expenses where

25

it deemed appropriate. Accordingly, review of the record and the Bankruptcy Court's comprehensive opinion makes clear that the exclusion of the Cohen Declaration and LDI report was not an abuse of discretion.

Appellants also argue that Bankruptcy Court erred in awarding fees that were not causally related to the alleged sanctionable conduct. The parties agreed before the Bankruptcy Court and agree before this Court that *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101 (2017) governs which of Gardner's fees and costs may be charged as a sanction for Appellants' bad-faith conduct pursuant to the Court's inherent power. Under *Goodyear,* "[t]he complaining party (here, [Gardner]) may recover 'only the portion of his fees that he would not have paid but for' the misconduct." *Id.* at 109 (quoting *Fox v. Vice*, 563 U.S. 826, 836 (2011)). The sanction must be compensatory, not punitive, meaning that it must be "calibrated to the damages caused by the bad-faith acts on which it is based." *Id.* at 108 (cleaned up). Therefore, the court must "establish a causal link—between the litigant's misbehavior and legal fees paid by the opposing party." *Id.*

Appellants take issue with the following three Sanction Categories for which the Bankruptcy Court awarded fees and expenses: (1) McGuckin's appeal of the Trustee Opinion; (2) the Recusal Motion and appeal to the Third Circuit for Writ of Mandamus; and (3) McGuckin's Motion for Reconsideration of the Trustee Opinion. ECF No. 22 at 55. Appellants argue that fees and expenses incurred in connection with those Sanction Categories were wrongly awarded because (1) those filings themselves were never deemed or argued to be frivolous or otherwise in bad faith and (2) they were all "directly related to appellate proceedings." *Id.* This Court does not find that any of the fees and expenses were wrongly awarded.

To begin, the Recusal Motion and the Motion for Reconsideration were filed with the Bankruptcy Court and, therefore, Appellants' argument that they are directly related to the

appellate proceedings is incorrect.  Furthermore, the issue is not whether the Appellants' conduct

in the appeals was itself sanctionable.  Rather, under *Goodyear*, the issue is whether Gardner's

fees and expenses in responding to those appeals would have been incurred but for Appellants'

sanctionable conduct before the Bankruptcy Court.  *Goodyear*, 581 U.S. at 109.  The answer is no.

The Bankruptcy Court carefully conducted a segregation of the expenses and fees incurred

in the case in order to determine which fees "would not have been incurred except for the

misconduct." *Id.* at 111.  In determining that the three Sanction Categories at issue here warranted

fees and expenses for Gardner, the Bankruptcy Court explained:

> The justification for permitting Gardner to apply for compensation
> for reasonable fees and costs incurred in connection with the
> Appeal, Recusal Motion, and Reconsideration Motion is not that
> these filings themselves were sanctionable or frivolous, but rather,
> that fees and costs incurred in connection with those filings simply
> would not have been incurred had McGuckin and PVI not
> orchestrated the filing of a bad faith involuntary bankruptcy petition.
> Thus, any award of reasonable fees and costs for these filings would
> not constitute an award for any type of misconduct occurring before
> an appellate court and, in fact, the Recusal Motion and
> Reconsideration Motion were filings in this Court, not an appellate
> court, in any event.

A.39 n.20.  The Bankruptcy Court further detailed its but-for analysis, as to each of the three

Sanction Categories that Appellants challenge.  First, as to the appeal of the Trustee Opinion, the

Bankruptcy Court explained the appeal was "directly connected to the actions surrounding the

filing of the bad faith Involuntary Petition, and expenses attributable to the Appeal would not have

been incurred but for the orchestration and defense of the bad faith Involuntary Petition which

resulted in the entry of the appealed Trustee Order." A.39.  Second, as to the Recusal Motion, the

Bankruptcy Court stated that the Motion "related entirely to determinations and statements made

in connection with the proceedings for Dismissal Motions, and expenses for defending against the

Recusal Motion would not have been incurred but for the orchestration of, consent to, and defense

27

of the bad faith Involuntary Petition." *Id.* Lastly, as to the Motion for Reconsideration, the Bankruptcy Court held Gardner's expenses defending against "it would not have been incurred but for McGuckin orchestrating, consenting to, and defending the Involuntary Petition, as those actions necessitated the entry of the Trustee Order up for reconsideration." *Id.*

The Bankruptcy Court made sure to clearly delineate which fees and expenses would not have been incurred but for Appellants' misconduct, and then, awarded sanctions solely to those categories where but-for causation was found. This Court, therefore, finds no reason to disturb the Bankruptcy Court's well-reasoned decision.

## IV.    **CONCLUSION**

For the foregoing reasons, the Court will affirm the Bankruptcy Court's sanction award against Appellants. An appropriate Order will follow.

**BY THE COURT:**

**HON. KAI N. SCOTT**
**United States District Court Judge**

28